## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                                        Case No.:  2:08-cr-42-FtM-29SPC

CARLOS YOUNG
OSNER EXANTUS
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on the Defendant Carlos Darius Young's Motion to Suppress Evidence (Doc. #60) filed on September 9, 2008, and Defendant Osner Exantus' Motion to Suppress Evidence (Doc. #64) filed on September 15, 2008. The Government's Response to Defendants' Motions to Suppress Evidence (Doc. # 66) was filed on September 18, 2008.

A hearing was set before the undersigned on September 23, 2008.[1]  At the hearing, Defendant Young was present and represented by CJA counsel, Ludwig Abruzzo.  Defendant Exantus was present and represented by CJA counsel, David Joffe.   The Government was represented by Managing Assistant United States Attorney Douglas Molloy.  The Government called one (1) witness, Trooper Adam Heinlein.  After the Government presented its evidence, Counsel on behalf of the Defendants, moved for a brief continuance to review a video tape of the incident that led to the arrests of Defendants Young and Exantus.  The hearing was continued until September 26, 2008, at which time the Government introduced Government's Exhibit #1, the video DVD of the

---

[1]The Transcript of this hearing will be referred to as Tr. 1.

view from Trooper Merritt's vehicle toward the area of Trooper Heinlein's vehicle and the vehicle involved in the stop.[2]  Atty. Ludwig Abruzzo called Defendant Young to testify.

The Defendant, Carlos Darius Young ("Defendant Young") argues the evidence obtained in this case should be suppressed as a result of the illegal search of the trunk of the vehicle in which Defendant Young was a passenger.  This includes all statements made by Defendant Young during the course of the stop.  The Defendant, Osner Exantus ("Defendant Exantus") argues  the evidence obtained in this case should be suppressed as a result of the illegal search of the trunk of the vehicle which Defendant Exantus was driving.   Defendant Exantus further argues all statements should be suppressed as a result of coercion on the part of the troopers.  The Court, having heard the testimony of the witnesses, viewed the exhibit in evidence, and listened to the arguments of counsel, finds the issue is now ripe for review.

## Evidence and Testimony

**Trooper Adam Heinlein: (Tr. 1, 4-60, Tr. 2, 5-24)**

Trooper Adam Heinlein ("Trooper Heinlein") has been with the Florida Highway Patrol ("FHP") for approximately eight (8) years.  (Tr. 1, 4:23-25, 5:1).  He has been trained in drug interdiction.   (Tr. 1, 19:8-16, 20:3-6).   He has been part of the drug interdiction unit for approximately three and one half years.  (Tr. 1, 33:13-17).

On March 11, 2008, Trooper Heinlein was monitoring northbound traffic on State Road 93 ("I-75").  (Tr. 1, 5:2-7).  At approximately 2:00 p.m., his attention was drawn to a red Hyundai traveling northbound in the left lane.  (Tr. 1, 5:8-18). He estimated the Hyundai to be traveling at approximately 80 miles per hour.  (Tr. 1, 5:18-20). The speed limit on I-75 is 70 mph.  (Tr. 1, 20:15-

---

[2]The Transcript of this hearing shall be referred to as Tr. 2.

17).   He pace clocked the vehicle traveling at 77 mph.  (Tr. 1, 5:22-24, 21:6-9). He subsequently

stopped the vehicle for speeding.

District because there were four occupants in the vehicle, Trooper Heinlein asked the driver to exit

the vehicle and step back to the patrol car.  (Tr. 1, 6:1-5). The driver was identified as Defendant

Exantus.  (Tr. 1, 6:6-12). Trooper Heinlein told Defendant Exantus  that he had paced him at 77

miles per hour to which Defendant Exantus responded, "I didn't want to slow down right away or

it would make me look guilty." (Tr. 1, 42:14-17).  He asked him where he was coming from to which

he replied "Broward County."  (Tr. 1, 6:23-24).   He asked him where he was going, to which he

replied "St. Petersburg."  (Tr. 1, 6:18-22).   At that time, Defendant Exantus produced a Florida

driver's license.  (Tr. 1, 6:8).

During the encounter, Trooper Heinlein noticed Defendant Exantus was extremely nervous.

(Tr. 1, 6:13-16, 7:15-16). He was asked for the registration to the vehicle, but was unable to produce

it.  (Tr. 1, 7:1-4). As a result, Trooper Heinlein approached the right front passenger side of the

vehicle.  (Tr. 1, 7:17-2143:22-23). He had the passenger roll down the window. (Tr. 1, 44:1-2).

Trooper Heinlein later identified the passenger as Defendant Young. (Tr. 1, 7:20-25, 8:1-12, 44:3-4).

Trooper Heinlein noted an odor of marijuana coming from inside the vehicle.  (Tr. 1, 9:5-6, 23:11-

21). Defendant Young became very abusive, argumentative, and belligerent towards the trooper. (Tr.

1, 9:2-4).  Trooper Heinlein noted a large box of CD's in the rear seat of the vehicle. (Tr. 1, 9:12-14).

 One of the back seat passengers, Defendant Dukes, offered to give him a CD as a gift.   (Tr. 1,

44:14-17). He took this as if they were trying to distract him from Defendant Young.  (Tr. 9:15-17,

45:1-3).

As a result of Defendant Exantus' nervousness, and Defendant Young's abusiveness, Trooper Heinlein ran the criminal histories of the occupants of the vehicle.   (Tr. 1, 9:18-21). He noted they had criminal histories which contained drug offenses, and that one had a prior homicide conviction. (Tr. 1, 10:2-6). At that time, he called for a backup and a K9 unit. (Tr. 1, 10:9-10). He began to write Defendant Exantus a speeding ticket. (Tr. 1, 10:14-18). During that time, in conversation, Defendant Exantus told Trooper Heinlein that he was going on a three day vacation but that he did not have any luggage and that he was going to purchase it. (Tr. 1, 49:20-23). He said he did not have a job. (Tr. 1, 49:23-24). He asked Defendant Exantus if he could search the vehicle, but Defendant Young answered and told him that he was not looking in the vehicle. (Tr. 1, 30:9-20).

Trooper Merritt arrived, went to the passenger side of the vehicle, and began speaking with Defendant Young.(Tr. 1, 10:15-22).   Although Trooper Heinlein could not hear the conversation, he could see that Defendant Young continued to be argumentative and continued to point his finger at Trooper Merritt.  (Tr. 1, 10:23-25, 11:1-2, 48:21-25). Trooper Heinlein finished writing the speeding citation. (Tr. 1, 11:3-4).

At that time, Officer Harris who is employed by the Department of Transportation arrived with his K9. (Tr. 1, 11:3-10). Officer Harris asked the troopers to remove the occupants of the vehicle so his K9 could perform an open air sniff. (Tr. 1, 11:13-17, 25:16-17, 48:10-17). The occupants exited the vehicle, however, Defendant Young continued to be argumentative. (Tr. 1, ). Trooper Heinlein kept his eyes on the passengers while Officer Harris handled the K9. (Tr. 1, 12:3-8). Officer Harris indicated that the dog gave a positive alert. (Tr. 1, 12:9-14). At that time, all of the occupants were told that they were being detained so that a search of the vehicle could be completed. (Tr. 1, 12:15-18).

Although the other individuals complied with the troopers requests by sitting in the patrol vehicles, Defendant Young continued to be abusive. He told the trooper that he did not have to comply. (Tr. 1, 12:19-25). Trooper Heinlein told Defendant Young that if he failed to comply he would be arrested. (Tr. 1, 13:5-7). As a result of Defendant Young's failure to cooperate, he was placed under arrest and charged with  Felon Failing to Obey Lawful Command of a Police Officer.(Tr. 1, 27:15-16).

When Trooper Heinlein attempted to place handcuffs on Defendant Young, a struggle ensued. (Tr. 1, 13:7-11, 26:21-25, 27:1-2). Trooper Merritt came to assist as Trooper Heinlein was struggling with Defendant Young on the ground. (Tr. 1, 13:10-15). Trooper Merritt had to spray Defendant Young with his aerosol subject restraint or mace. (Tr. 1, 14:2-4, 27:3-4). Everybody got sprayed with the mace. (Tr. 1, 14:6).

Trooper Merritt continued to keep an eye on the other three passengers. (Tr. 1, 13:17-21). At that time, Officer Harris ordered the other three to lie on the ground. (Tr. 1, 13:23-25, 14:1). They did not comply but instead tried to gain access back into the vehicle. (Tr. 1, 14:6-13). Trooper Merritt pulled his firearm after Defendant Young was sprayed and the three other occupants tried to gain access to the vehicle. (Tr. 1, 52:9-17). He repeatedly told them to get to the ground. The situation was escalating. (Tr. 1, 52:22-24). Trooper Merritt then disengaged himself from the struggle between Trooper Heinlein and Defendant Young, and ordered the occupants away from the vehicle. (Tr. 1,15: 1-5). Trooper Heinlein eventually managed to secure Defendant Young and place him in the back seat of his patrol car. (Tr. 1, 15:6-7). He noticed that the three occupants of the vehicle had now begun to run towards the southwest and that they had already gained access to the median. (Tr. 1, 15:8-10). Trooper Merritt chased after the three occupants of the vehicle. (Tr. 1,

15:11-12). Trooper Grider, a K9 officer, arrived on the scene and released his K9 to assist in the chase. The K9 was able to apprehend all three suspects. (Tr. 1, 15:14-20). They had run about 500 yards before the dog apprehended them. (Tr. 1, 54:21-25).

Trooper Heinlein was still at his vehicle with Defendant Young. He was attempting to retrieve his medical bag to render first aid to Defendant Young. (Tr. 1, 16:1-3, 31:4-5). He heard Defendant Young say "help me, help me, I can't breathe... you can have everything in the trunk..... there's one and a half kilos of cocaine in there. I'm done fighting with you, just help me, just wipe off my face." (Tr. 1, 16:7-14, 31:8-18). He did not ask Defendant Young any questions. (Tr. 1, 16:23-25, 17:1). He continued to render first aid by wiping Defendant Young's face off with an alcohol swab, fanning Defendant Young with a blanket, and by having him sit forward and letting the vehicle's air conditioning blow into his face. (Tr. 1, 16:15-22, 17:7-12). At that point, he read Defendant Young his <u>Miranda</u> warnings from a card that he had retrieved from his vehicle.(Tr. 1, 17:15-18, 28:16-20).

Defendant Young then told him that he had approximately one and a half kilos of cocaine in the trunk of the vehicle, that he had been attempting to sell it, but had been unable to do so. (Tr. 1, 17:19-24). Trooper Heinlein then conducted an interior search of the vehicle. (Tr. 1, 18:3-4 ). He found a shoe box in the trunk. (Tr. 1, 18:6-7). The box contained two bags with 17 separate bags inside of them. (Tr. 1, 18:11-13). The substance in the bags was field tested by Trooper Merritt in Trooper Heinlein's presence. The substance tested positive for cocaine. (Tr. 1, 18:14-18).

## Defendant Carlos Young (Tr. 2, 25-35)

Defendant Young described the incident after he was removed from the vehicle so that the dog free air sniff could take place. He indicated that he continued to ask the officer why he should

be seated in the patrol car.  (Tr. 2, 26:20-25, 27:1-2).  The trooper refused to tell him why although he asked many times. He indicated he put his hands up in submission.  He tried to make a phone call but the officer refused to let him do so.  (Tr. 2, 27:3-8 ).  He testified that he was not resisting the officer.  (Tr. 2, 27:12-15).  That is when he got maced.   (Tr. 2, 27:7-8).

Regarding the testimony by Trooper Heinlein, Defendant Young stated that he never told Trooper Heinlein that there was cocaine in the vehicle, and he never game him permission to search. He also claimed during direct examination that he was not told that he was under arrest, but rather thrown up against the car, was never advised of his right to an attorney, and was never read his Miranda warnings.  (Tr. 2, 28:5-9,17-19). He also indicated that he never gave anyone permission to open the trunk, and that he had no idea there was cocaine in the trunk.  (Tr. 2, 29:15-18). He never told Trooper Heinlein there were drugs in the car, he only asked him if he would help him, and told him his face was burning , and he couldn't breathe. (Tr. 2, 29:11-14).

On cross examination, Defendant Young admitted to having "a few" felony convictions including a prior drug conviction.  (Tr. 2, 31:2-9). He denied knowing there was cocaine in the trunk of the vehicle.  (Tr. 2, 29:22-23 ).  He denied making the statement that there was cocaine in the trunk and that he was unable to sell it. (Tr. 2, 29:24-25, 30:1-2).  Defendant Young testified that he was calm during the incident.  (Tr. 2, 30:5-10).  He further denied ever being upset and having his co-defendants tell him to calm down and relax when he was told to sit in the officer's patrol car.  (Tr. 2, 30:14-21).  He denied making the statement "Take it all, take it all, there's a kilo or there's cocaine in the trunk, take it all, just – just help me."  (Tr. 2, 30:22-25, 31:1).

**DISCUSSION**

Although Defendants Young and Exantus filed separate Motions to Suppress, the Motions are duplicative, therefore, the Court will address them as one. The Defendants argue any statements made by Defendant Young during the traffic stop and ensuing arrest were a violation of DefendantYoung's <u>Miranda</u> rights and the subsequent search of the subject vehicle violated the Constitution. As a result, the Defendants argue the cocaine seized from the trunk of the vehicle should be suppressed as the "fruit of the poisonous tree." The Government argues the arrest and subsequent search of the vehicle's trunk were valid and performed in compliance with the Constitution. The Government further argues that Defendant Young was Mirandized prior to questioning and that any statements made prior to his <u>Miranda</u> warnings were spontaneous statements made as an exception to <u>Miranda</u>.

*(1) Whether Defendant Young's Statements were made in Violation of His Miranda Rights*

In their briefs, the Defendants argue that Defendant Young's <u>Miranda</u> rights were violated because he made his incriminating statements without receiving <u>Miranda</u> warnings while he was in custody and under duress. The Government states the Defendant freely made a spontaneous utterance regarding the cocaine in the vehicle's trunk.

<u>Miranda v. Arizona</u>, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). Under <u>Miranda</u>, custody is the depravation of freedom of action normally associated with an arrest. <u>Id</u>. at 444. The initial determination of custody

depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam)*. A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980).  Some types of questions are not considered interrogations and therefore do not require Miranda warnings.  Courts have concluded that routine, general on-the-scene questioning is not interrogations for purposes of Fifth Amendment and Miranda warnings. *See* U.S. v. Ozuna, 170 F.3d 654, 657-659 (6th Cir. 1999) (holding that asking routine questions about a person's identity and natural origin were not interrogations for Miranda purposes); *But see e.g.* U.S. v. Gonzalez-Sandoval, 894 F.2d 1043, 1046-1047 (9th Cir. 1990) (holding that an interrogation occurred where border agents had reason to believe that a person was entering the country illegally and therefore would incriminate themselves with their answers).

While the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called Miranda rights, the rule extends only to the functional equivalent of an interrogation. U.S. v. McKenzie,132 Fed. Appx. 788, 789-790 (11th Cir. 2005) (*citing* Innis, 446 U.S. 299). But, voluntary statements-even those made without a Miranda reading-are admissible as long as they are given freely and voluntarily without compelling influences. Id. at 299-300; Miranda, 86 S.Ct. at 478.

*Credibility Analysis*

The testimony of Defendant Young and Trooper Heilein are in direct contradiction in regard to the facts and circumstances surrounding Defendant Young's statements. Trooper Heinlein testified that as he was attempting to retrieve his medical bag to render first aid to Defendant Young that Defendant Young said "help me, help me, I can't breath... you can have everything in the trunk..... there's one and a half kilos of cocaine in there." (Tr. 1, 16:7-14, 31:8-18). Defendant Young testified that he never made any comments to Trooper Heinlein suggesting there was cocaine in the vehicle's trunk. (Tr. 2, 30:22-25, 31:1). Thus, due to the conflict in testimony, the Court must make a credibility determination prior to its Miranda analysis.

When weighing the credibility of witnesses, the Court does not look at the status of the witness, but rather the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing. U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002).

Trooper Heinlein testified that Defendant Young spoke to him about cocaine in the trunk of the vehicle. On the stand, Defendant Young testified he never told Trooper Heinlein there were drugs in the trunk, he only asked the trooper if he would help him, and told him his face was burning, and that he couldn't breath.

Defendant Young admitted that he has "a few"l felony convictions including past drug related convictions. (Tr. 2, 31:2-9). Evidence of past criminal convictions can be used to weigh the credibility of an accused who takes the witness stand "if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused." Fed. R. Evid. 609(1)(a). In this instance, the probative value of weighing Defendant Young's prior felony convictions

outweighs the prejudicial effect to Defendant Young. Therefore, the Court will consider Defendant Young's past felony convictions in its credibility analysis.

After a review of the witnesses on the stand, the video DVD of the incident, Defendant Young's demeanor during the arrest, and his interest in the outcome of the suppression, the Court determines that Trooper Heinlein's testimony is more credible than Defendant Young's testimony. Having made that determination, the Court will now address the Miranda issues.

Defendant Young argues that his alleged statements were made under duress and further that he was interrogated while in custody without first being read his Miranda rights. Defendant Young states that he was in distress from being pepper sprayed during the altercation with Trooper Heinlein and Trooper Merritt. In his brief, Defendant Young states that Trooper Heinlein refused to render him any aid to relieve the burning and pain from the mace unless he allowed Trooper Heinlein to search his trunk. (Doc. # 64, 2: ¶ 6). Trooper Heinlein testified that he was attempting to retrieve his medical bag to render first aid to Defendant Young when he heard Defendant Young say "help me, help me, I can't breathe... you can have everything in the trunk.....there's one and a half kilos of cocaine in there." (Tr. 1, 16:7-14, 31:8-18). At that point, Trooper Heinlein read Defendant Young his Miranda warnings from a card that he had retrieved from his vehicle. (Tr. 1, 17:15-18, 28:16-20). Defendant Young then told him that he had one and a half kilos in the trunk of the vehicle, that he had been attempting to sell it, but couldn't. (Tr. 1, 17:19-24). Trooper Heinlein stated that he did not ask Defendant Young any questions prior to the Defendant making his incriminating statements. (Tr. 1, 16:23-25, 17:1). The DVD video submitted by the Government shows Trooper Heinlein rendered first aid by wiping Defendant Young's face with what appeared to be a moist cloth, by

fanning his face with a blanket, and by having him sit forward and letting the vehicle's air conditioning blow into his face. (Gov't. Ex. 1).

Based upon Trooper Heinlein's testimony, Defendant Young made his statement regarding the cocaine in the trunk after the struggle was over, Defendant Young had been placed in the backseat of the patrol car, and Trooper Heinlein was preparing to render him first aid. Although he was in custody, Defendant Young was not being interrogated. A person need only be informed of his Miranda rights if he is in custody and is being interrogated. 384 U.S. at 478-479. The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police... that the police should know are reasonably likely to elicit an incriminating response from the suspect. Innis, 446 U.S. at 300-301.

It is clear from the testimony that Defendant Young's original statements were spontaneous statements made to Trooper Heinlein as he attempted to render the Defendant first aid. Voluntary and spontaneous comments by an accused are admissible evidence if the comments were not made in response to government questioning." U.S. v. Muhammad, 554 F. Supp. 2d 1314, 1320 (M.D. Fla. 2008);U.S. v. Jules, 244 Fed. Appx. 964, 971,(11th Cir. 2007) (citing Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) (holding that spontaneous comments are admissible even in situations after Miranda rights are asserted by the accused). Here , there was no interrogation. Instead, Defendant Young blurted out that Trooper Heinlein could have the cocaine in the trunk. (Tr. 1, 16:7-14, 31:8-18). Trooper Heinlein then read Defendant Young his Miranda rights and Defendant Young repeated his previous statements. (Tr. 1, 17:15-24). There was no force or coercion used in order to make Defendant Young confess to possession of cocaine. Therefore, it is respectfully recommended that the Motion to Suppress Defendant Young's statements should be denied.

### (2) Whether the Search of the Vehicle's Trunk Violate the Fourth Amendment

The Defendants argue that the cocaine found in the trunk of the subject vehicle is the "fruit of the poisonous tree". The Defendants further argue the traffic stop took longer than the purpose of the initial traffic stop and thus, any search violated the Fourth Amendment. They further argue there was no probable cause to search the trunk.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. v Martin, 297 F.3d 1308, 1312 (11th Cir. 2002). However, there are exceptions to the Fourth Amendment's restrictions. The Supreme Court has held that if there was probable cause to search a vehicle, a warrantless search would not be deemed a violation of the Fourth Amendment if the facts of the case would have justified a warrant even through a warrant was not actually obtained. U.S. v. Ross, 456 U.S. 798, 809, 102 S. Ct. 2157, 2152 (1982). The automobile exception holds that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." U.S. v. Watts, 329 F.3d 1282, 1285 (11th Cir. 2003). Id. at 1285 (citing Pennsylvania v. Labron, 518 U.S. 938, 940, 116 S. Ct. 2485 (1996)). No special exigency is required for a warrantless search beyond a showing that the vehicle is mobile. Maryland v. Dyson, 527 U.S. 465, 467, 119 S. Ct. 2013 (1999) (per curiam).

### (a) Whether the Traffic Stop Detention Took Longer than the Purpose of the Initial Traffic Stop

The Defendants initial objection states they were detained for a period longer than necessary to conduct a traffic stop for speeding. A traffic stop is a seizure within the limits of the Fourth Amendment. U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing Prouse, 440 U.S. at 653). Because a routine traffic stop is only a limited form of seizure, it is more analogous to an

investigative detention than to a custodial arrest. Purcell, 236 F.3d at 1277. Therefore, the Court's analysis of a traffic stop is similar to that found in Terry v Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Purcell, 236 F.3d at 1277. "Under Terry, an officer's actions during a traffic stop must be reasonably related in scope to the circumstances which justified the interference in the first place." Id. (citing Terry, 392 U.S. at 20) (internal quotations omitted)). Furthermore, the duration of the traffic stop is limited to the time necessary to effectuate the purpose of the stop. U.S. v. Pruitt, 174 F.3d 1215, 1219 (11th Cir. 1999). The traffic stop may not last any longer than the time necessary to process the traffic violation unless there is "articulable suspicion of other illegal activity." Holloman, 113 F.3d at 196.

When Trooper Heinlein asked the Defendant Exantus for his registration, he could not produce the registration but referred the trooper to the front seat passenger. (Tr. 1, 7:1-4). Trooper Heinlein approached the right front passenger side of the vehicle and had the passenger roll down the window. (Tr. 1, 7:17-21, 43;22-23, 44:1-2). Trooper Heinlein later identified the passenger as Defendant Young. (Tr. 1,7:20-25, 8:1-12, 44:3-4). He noted an odor of marijuana coming from inside the vehicle. (Tr. 1, 9:5-6, 23:11-21). Defendant Young became very abusive, argumentative, and belligerent towards the trooper. (Tr. 1, 9:2-4). Trooper Heinlein also noted that Defendant Exantus was extremely nervous. (Tr. 1, 6:13-16, 7:15-16). Based upon the nervousness of Defendant Exantus and Defendant Young's abusiveness, Trooper Heinlein ran the criminal histories of the occupants of the vehicle. (Tr. 1, 10:9-10). He found them to have criminal histories containing drug offenses, and that one had a prior homicide conviction. (Tr. 1, 10:2-6). At that time, he called for a backup and a K9 unit. (Tr. 1, 10:9-10). He began to write Defendant Exantus a speeding ticket. (Tr. 1, 10:14-18).

While it is true that an officer may not detain an individual as a ruse to obtain a canine officer to conduct a narcotics investigation, that is not the case here.  Trooper Heinlein testified that he had not finished writing the warning citation before he called for a canine unit and that Ofc. Harris arrived with the K9 as he was finishing the citation.  Thus, the speeding ticket was being written and completed at approximately the same time that Ofc. Harris arrived.

Additionally, Trooper Heinlein testified that he could smell the odor of marijuana when Defendant Young rolled down his window to speak with him. (Tr. 1, 9:5-6, 23:11-21 ).  The smell of marijuana alone gave Trooper Heinlein  sufficient "articulable suspicion of other illegal activity" to detain the Defendants for a period of time longer than that needed to write a speeding ticket.  The circumstances surrounding the Defendants actions, their failure to provide a registration for the vehicle, Defendant Young's belligerent behavior, Defendant Exantus' nervousness, and the odor of marijuana, all provided a reasonable suspicion that allowed Trooper Heinlein to inquire into areas that exceeded the initial traffic stop.  Therefore, the duration of the traffic stop did not exceed the time ordinarily needed to approach the vehicle, speak with the Defendant, run a records check, and process a citation for a traffic violation.

### (b) Whether Trooper Heinlein had Probable Cause to Search the Vehicle

When he approached the vehicle's passenger side and had Defendant Young roll down the passenger window to inquire about the vehicle's registration, Trooper Heinlein smelled the odor of marijuana emanating from inside the vehicle. (Tr. 1, 9:5-6, 23:11-21).  The odor of marijuana emanating from the vehicle, without any other reason, gave Trooper Heinlein sufficient reason to believe it contained contraband and therefore, sufficient cause to conduct a warrantless search on the vehicle. U.S. v. Griffin, 109 F.3d 706, 708 (11th Cir. 1999) (holding good cause to search the vehicle

existed due to the strong odor of marijuana emanating from inside the vehicle); *See* State v. Bennett, 481 So. 2d 971, 972 (Fla. 5th DCA 1986) (holding that the smell marijuana emanating from a vehicle gives an officer probable cause to search a vehicle without a warrant).

Trooper Heinlein called for a K9 to conduct a free air sniff of the vehicle.  Officer Harris arrived with his K9 and asked the troopers to remove the occupants of the vehicle so his K9 could perform an open air sniff.  (Tr. 1, 11:13-17, 25:16-17, 48:10-17).  After the K9 completed the open air sniff of the vehicle, Ofc. Harris informed Trooper Heinlein that the K9 gave a positive alert.  (Tr. 1, 12:9-14).  "The alerting of a drug-sniffing dog to a person's property supplies not only reasonable suspicion, but probable cause to search that property." Hearn v. Board of Public Education, 191 F.3d 1329, 1333 (C.A.11 (Ga.),1999) (citing United States v. Banks, 3 F.3d 399, 402 (11th Cir.1993) ( holding "[P]robable cause arises when a drug-trained canine alerts to drugs" ).

When the property alerted to is in a vehicle, the Constitution permits a search of the vehicle immediately, without resort to a warrant. California v. Acevedo, 500 U.S. 565, 581, 111 S. Ct. 1982, 114 L.Ed.2d 619 (1991) (upholding warrantless search of a paper bag in an automobile which the police had probable cause to believe contained contraband); United States v. Forker, 928 F.2d 365 (11th Cir.1991).  Therefore, Trooper Heinlein did not violate the Defendant's Fourth Amendment rights when he searched the vehicle's trunk and found a shoe box full of cocaine.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

(1)    The Defendant Carlos Darius Young's Motion to Suppress Evidence (Doc. #60) filed on September 9, 2008 should be **DENIED.**

(2)    The Defendant Osner Exantus' Motion to Suppress Evidence (Doc. #64) filed on September 15, 2008 should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this ___16th___ day of October, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record